**05 CV   6898**

ECF CASE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------

ILLINOIS STATE BOARD OF
INVESTMENT, Individually and On
Behalf of All Others Similarly Situated,

                    Plaintiff,

          vs.

AUTHENTIDATE HOLDING CORP.,
SURENDRA PAI, JOHN J. WATERS,
DENNIS H. BUNT, PETER R. SMITH and
JOHN T. BOTTI,

                  Defendants.

---------------------------------------------------------

Civil Action No. 1:05-CV-_____

CLASS ACTION

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL



RECEIVED
AUG 0 2 2005
U.S.D.C. S.D. N.Y.
CASHIERS

# TABLE OF CONTENTS

SUMMARY OF THE ACTION ..................................................................................1

JURISDICTION AND VENUE ...............................................................................7

THE PARTIES.........................................................................................................9

    Other Entities Involved in the Fraud..............................................................11

    Group Pleading ..............................................................................................12

    Duties of the Individual Defendants ...............................................................12

FRAUDULENT SCHEME.....................................................................................14

FRAUD-ON-THE-MARKET PRESUMPTION .....................................................15

BACKGROUND ....................................................................................................16

FALSE AND MISLEADING STATEMENTS .......................................................18

SCIENTER ALLEGATIONS.................................................................................37

CONTROL PERSON LIABILITY..........................................................................38

THE SAFE HARBOR PROVISION OF THE PSLRA IS
INAPPLICABLE ...................................................................................................39

CLASS ACTION ALLEGATIONS ........................................................................39

FIRST CLAIM FOR RELIEF ................................................................................41

    Violation Of Section 11 Of The Securities Act Against Defendants
    Authentidate, Bunt, Smith, and Botti..............................................................41

SECOND CLAIM FOR RELIEF ...........................................................................43

    Violation Of Section 12(a)(2) Of The Securities Act Against Defendant
    Authentidate and the Individual Defendants Who Signed the Offering
    Prospectus .....................................................................................................43

THIRD CLAIM FOR RELIEF ...............................................................................44

    Violation Of Section 15 Of The Securities Act Against Defendants
    Authentidate, Bunt, Smith, and Botti..............................................................44

FOURTH CLAIM FOR RELIEF ...........................................................................45

    Violation Of Section 10(b) Of The Exchange Act and Rule 10b-5
    Promulgated Thereunder Against All Defendants...........................................45

FIFTH CLAIM FOR RELIEF ................................................................................49

    Violation Of Section 20(a) Of The Exchange Act Against the Individual
    Defendants .....................................................................................................49

Plaintiff Illinois State Board of Investment ("Plaintiff" or "ISBI") alleges the following based upon the investigation of Plaintiff's counsel, which included inspection of United States Securities and Exchange Commission ("SEC") filings by Authentidate Holding Corp. ("Authentidate" or the "Company"), as well as regulatory filings and reports, securities analysts' reports, media reports and advisories about the Company, press releases and other public statements issued by the Company. Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein, and will be obtainable after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Authentidate's publicly traded securities during the period August 6, 2002 through and including May 27, 2005 (the "Class Period" or "Relevant Period"), against Authentidate and certain of its officers and directors for violations of the Securities Act of 1933 (the "Securities Act") and of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Authentidate is a manufacturer of authentication software and document imaging systems. The Company provides web-based content authentication services that address the verification of digital information in all business processes.

3.      On August 6, 2002, Authentidate announced that the Company and the United States Postal Service ("USPS") had entered into a Strategic Alliance Agreement (the "USPS Agreement" or the "Agreement"), pursuant to which Authentidate would serve as the preferred provider of the USPS Electronic Postmark ("EPM") service. The EPM service is a web-based security service that allows users to verify authenticity, detect tampering and date and timestamp electronic documents and files. Prior to the announcement of the USPS Agreement,

Authentidate's stock price traded at $4.10 per share. In the months following the announcement, the Company made several additional false and misleading positive statements and omissions regarding the USPS Agreement which drove the stock price up to as high as $18.69 per share during the Class Period. As the stock price rose on the Defendants' ongoing false and misleading statements and/or failure to disclose the truth regarding the USPS Agreement, two additional significant events occurred: (1) the Company raised millions of dollars in a two-part securities offering of common stock in February 2004 (the "February 2004 Securities Offering") based, in large part, on false and misleading statements regarding the USPS Agreement; and (2) the Company's Chief Executive Officer ("CEO") and President as well as its Chief Financial Officer ("CFO") collectively sold thousands of shares of Authentidate common stock for proceeds of more than $1.7 million.

4.     Specifically, through the issuance of various false and misleading statements concerning the USPS Agreement, in February 2004, the Company was able to complete the February 2004 Securities Offering to certain institutional and accredited investors at $13.75 per share, for which it received approximately $69 million in net proceeds. Roth Capital Partners, LLC ("Roth") helped promote the stock into a bullish state based on the Company's assurances that Authentidate's revenues would grow exponentially through the USPS Agreement. Significantly, while Roth was issuing high projections for the Company's coming year, it also served as a placement agent/underwriter of part of the February 2004 Securities Offering. Roth's incentives for promoting the stock at this time were influenced by its role in the securities offering.

5.     In addition, prior to any corrective disclosures, several of the Company's senior executives, including its CFO, Dennis H. Bunt ("Bunt") and former CEO and President, John

2

T. Botti ("Botti"), among others, collectively sold 156,000 shares of their personally-held
Authentidate common stock at artificially inflated prices on October 17, 2003, October 20,
2003 and December 8, 2003, amounting to over $1.7 million in artificial proceeds. By selling
their stock during an upswing, the senior executives captured the advantage of the artificial
inflation. Moreover, former CEO and President Botti was awarded a cash bonus of $165,000
during the 2004 fiscal year, largely due to his efforts in connection with the February 2004
Securities Offering.

6.      Beginning on August 6, 2002, the Company issued several statements to the
investing public which failed to disclose known adverse facts about revenue metrics required
under the USPS Agreement. From the time the USPS Agreement was announced, Defendants
described it as clearly constituting a material component of the Company's business. On
several occasions throughout the Class Period, the Defendants issued additional false and
misleading statements concerning the USPS Agreement that failed to disclose required revenue
metrics, Authentidate's inability to comply with those requirements and other inabilities to
deliver and perform under the Agreement, facts known to the Defendants from the inception of
the Agreement. Furthermore, the Company issued a series of false and misleading statements
concerning its internal controls and concealed certain problems it was experiencing with those
controls.

7.      While the Company issued false and misleading positive statements early in the
Class Period concerning the USPS Agreement, as the Class Period proceeded, the Company
failed to issue statements concerning the status of the USPS Agreement, the Company's
ongoing failure to perform under the Agreement and the Defendants' ongoing negotiations
relating thereto.

8.      Specifically, from February 2004 through September 2004, Authentidate made several public statements with the knowing omission of any mention of the USPS Agreement, which it had previously touted as a central component of its business.  Thus, investors began to lose faith in the Company's ability to carry out the Agreement.  As a result, Authentidate's share price began to decline to reflect the decreasing investor confidence -- despite the overall increase in market price of stocks on the NASDAQ National Market System ("NASDAQ") at the time.

9.      These developments are a clear indication that the Defendants' materially false and misleading statements and omissions regarding the true nature of Authentidate's USPS Agreement had artificially inflated the price of the Company's publicly traded securities.  As the Company failed to release continued promotional statements regarding the USPS Agreement and its expectations for growth, Authentidate stock declined to as low as $5.11 per share in August 2004.

10.     In September 2004, the Company resumed issuing false and misleading statements concerning its business, in general, as well as the USPS Agreement, in particular, and its stock price, therefore, remained relatively stable due to the artificial inflation.  On September 8, 2004, after receiving a notice of deficiency from the USPS, Authentidate revealed for the first time in a press release (the "September 8, 2004 Press Release") that the USPS Agreement had contained performance metrics from its inception, and that the Company had failed to comply with those requirements.  On this news, the Company's share price fell from a high of $8.00 per share on September 8, 2004, to as low as $7.01 over the next trading day, on combined volume of over 1.9 million shares.  As a result of this announcement, Authentidate lost approximately $32.7 million in market capitalization.

11.   In order to downplay the significance of these announcements, however, Defendants resumed issuing false and misleading statements by assuring investors that Authentidate and the USPS had reached an "agreement in principle" to amend the Company's performance metrics under the USPS Agreement, and that the amendment would be finalized shortly.  Without this assurance, the Company's stock price would have dropped even further. In reality, the USPS never modified the Agreement or the performance metrics, as evidenced by the Company's subsequent announcement on May 27, 2005 disclosing its continued failure to perform on the original metrics.  Accordingly, investors were unable to comprehend the true nature and extent of Authentidate's inability to comply with the USPS Agreement, or to make an informed judgment regarding the potential financial impact of the revenue issues affecting the Company's inability to comply with the Agreement.

12.   On November 15, 2004, Defendant Botti resigned as CEO and President of the Company.  Authentidate had previously indicated in its public filings that the loss of Botti's services would have a material adverse effect on Authentidate's business and prospects. Accordingly, after Botti announced his resignation, Authentidate's stock declined to below $6.00 per share.  Despite this announcement, Authentidate's stock price remained relatively stable since Defendants continued to issue additional false and misleading positive statements about the Company's business.

13.   Ultimately, on April 13, 2005, Authentidate announced the dismissal of its outside accounting firm, PricewaterhouseCoopers LLP ("PwC").  Two days later, on April 15, 2005, CFO Bunt sent a letter to certain members of the Company's board of directors, advising them of the existence of corporate governance issues.  The Company subsequently announced on April 29, 2005, that it had engaged special counsel to assist its audit committee in "resolving

5

certain internal controls and corporate governance issues raised by the Chief Financial

Officer."

14.    On May 27, 2005, Authentidate issued a press release (the "May 27, 2005 Press

Release") in which it announced that it had received a *second* notice from the USPS stating

that the Company had failed to attain the minimum revenue required by the USPS Agreement

during the period February 2005 through April 2005.  This release also confirmed that the

Company was dishonest when it previously stated that it had reached "an agreement in

principle" to amend the USPS Agreement.  The Company also disclosed that the USPS might

exercise its right to terminate the USPS Agreement if Authentidate was unable to cure the

default.

15.    The May 27, 2005 Press Release, entitled "Authentidate Announces New

Developments With United States Postal Service," stated in part:

> The Strategic Alliance Agreement designates Authentidate as the preferred
> provider of the USPS Electronic Postmark® (EPM) service. At the time
> the agreement was signed, the parties agreed on certain performance
> metrics which, as previously reported, had not been attained. The parties
> have been discussing a new arrangement since last year.
>
> \*       \*       \*
>
> In spite of these recent successful joint efforts by Authentidate and the
> USPS, the parties have been unable so far to agree on new performance
> metrics. **On May 23, 2005 Authentidate was again notified by the United
> States Postal Service that it has failed to attain the revenue metrics
> required by the Strategic Alliance Agreement for the period of February
> 2005 through April 2005.** The Postal Service has advised Authentidate in
> this letter that it is willing to discuss any further plans Authentidate may
> have to attain the performance metrics. **However, the Postal Service has
> also stated that it intends to exercise its right to terminate the Strategic
> Alliance Agreement if Authentidate is unable to cure this default.**

16.    On this news, the Company's share price fell an additional $0.54, or 15.5%, from

its closing price of $3.48 on May 27, 2005, to close at $2.94 on the following trading day, May

31, 2005, on unusually high trading volume of 1.28 million shares. As a result of this announcement, Authentidate lost over $17.8 million in market capitalization.

## JURISDICTION AND VENUE

17. This action arises under Sections 11, 12(a)(2), and 15 of the Securities Act [15 U.S.C. §§ 77(k), 77(a)(2) and 77(o)]; and Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)], and the rules and regulations promulgated thereunder, including SEC rule 10b-5, [17 C.F.R. 240.10b-5].

18. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 22 of the Securities Act 15 U.S.C. § 77v and 28 U.S.C. § 1331.

19. Venue is proper in this District pursuant to the provisions of Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Authentidate's website identifies 2 World Financial Center, New York, NY as the location for contacting the Company. Additionally, many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this District.

20. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce and the facilities of national securities exchanges and markets. The following chart indicates particularly significant events that took place prior to and during the Class Period, including Defendants' false and misleading statements and subsequent disclosures, insider trading, combined with a graph of the Company's stock price:



## Authentidate Holding Corporation Event Study
### Class Period: August 6, 2002 - May 27, 2005

8/6/02 - Authentidate announces that it would serve as the preferred provider of the USPS EPM Service (the "USPS Agreement").

2/4/04 - Company completes an offering of 136,734 shares of its common stock raising approximately $1.80 million in the process.

2/5/04 - Authentidate issues a press release announcing that it had completed an offering of 5,223,636 shares of its common stock receiving approximately $67 million in net proceeds.

9/8/04 - Authentidate issues a press release stating that the Company had failed to comply with standards as set forth in the USPS Agreement.

4/13/05 - Authentidate announces the dismissal of its outside accounting firm, PricewaterhouseCoopers LLP.

4/15/05 - Company's CFO sends a letter to certain members of the Company's board of directors, advising them of the existence of corporate governance issues.

4/29/05 - Company announces it has engaged special counsel to assist its audit committee in "resolving certain internal controls and corporate governance issues raised by the Chief Financial Officer."

10/17/03-10/20/03 - Dennis Bunt, Authentidate CFO, sells 26,000 Authentidate shares for gross proceeds of $267,750.

12/8/03 - John Botti, former Authentidate CEO and President, sells 130,000 Authentidate shares for gross proceeds of $1,482,000.

5/27/05 - Company announces it has received a second notice from the USPS stating that the Company had failed to attain the minimum revenue required by the USPS Agreement during the period February 2005 through April 2005.

8/6/02: Beginning of proposed Class Period

5/27/05: Ending of proposed Class Period

8

## THE PARTIES

21.     Plaintiff ISBI purchased the Company's publicly traded securities as detailed in the attached Certification and was damaged thereby.  ISBI oversees the net investment of assets for the General Assembly Retirement System, the Judges Retirement System and the State Employees' Retirement System of Illinois comprising $10.4 billion in assets representing in excess of 150,000 retired members.

22.     Defendant Authentidate was organized in 1985 as Bitwise Designs, Inc. and changed its name to Authentidate Holding Corporation in 2001.  The Company is based in Schenectady, New York, with offices in New York City and other locations.  Originally formed to develop and produce logic analyzers, the Company is now a multi-million dollar manufacturer and distributor of computer-related products, and developer of software products. Authentidate consists of several subsidiaries including DJS Marketing Group, Inc., Authentidate, Inc., Authentidate International AG, Trac Medical Solutions, Inc., and its DocStar Division.  The Company, through its subsidiaries, engages in the development, marketing, and sale of security software technology, document imaging software products, and systems integration services and products in the United States.  Its products include DocStar document imaging software products, the Authentidate authentication and security software products, and system integration services.  Authentidate's products and services are also comprised of personal computers, workstations, and portable personal computers, as well as microcomputer peripherals, networks, components accessories, Internet/Intranet development, and Internet and network services.  The Company's core service offering is based in secure content authentication, utilizing technology and business processes based upon auditable time stamps, hash codes and non-repudiation services.  Authentidate helps protect content by

detecting the fraudulent tampering or inadvertent altering of electronic data to maintain verifiable evidence of content authenticity. Its products are primarily distributed through an international dealer network. Authentidate is a publicly traded company whose common stock is traded on the NASDAQ under the ticker "ADAT."

23.    Defendant Surendra Pai ("Pai") has been CEO of Authentidate since November 2004.

24.    Defendant John J. Waters ("Waters") is Chief Administrative Officer of Authentidate. Waters joined the Company's Board of Directors on July 8, 2004. On July 19, 2004, Waters was appointed as Executive Vice President - Chief Administrative Officer of Authentidate.

25.    Defendant Dennis H. Bunt has served as CFO of Authentidate since September 1992. During the Class Period, Bunt sold 26,000 shares of his Authentidate stock on October 17, 2003 and October 20, 2003 and realized proceeds of $267,750. These insider sales consisted of approximately 97% of all shares that Bunt owned in the Company. Bunt's insider trading is suspicious because it is dramatically out of line from his prior trading practices. While Authentidate securities traded during September 2003 at approximately $3.05 per share, as the stock price increased to over $10 per share in October, Bunt capitalized on that increase and sold the shares. Additionally, Bunt was granted 80,000 options by the Company during the fiscal year ended June 30, 2004.

26.    Defendant Peter R. Smith ("Smith") was Chief Operating Officer of Authentidate from November 17, 2003 until December 2004 when he resigned.

27.    Defendant Botti was Chairman, President and CEO of Authentidate until November 2004. Botti resigned as CEO and President on November 15, 2004, but remained

serving as Chairman of Authentidate's Board of Directors until January 20, 2005. Botti is serving in a consulting capacity for the Company until February 2006. During the Class Period, Botti sold 130,000 shares of his Authentidate stock on December 8, 2003 and realized proceeds of $1,482,000. These insider sales consisted of approximately 30% of all shares that Botti owned of the Company. Botti's insider trading is suspicious because it is dramatically out of line from his prior trading practices. While Authentidate securities traded during September 2003 at approximately $3.05 per share, as the stock price increased to over $11 per share in December, Botti capitalized on that increase and sold the shares. Additionally, Botti was granted 450,000 options by the Company during the fiscal year ended June 30, 2004. Moreover, Botti was awarded a cash bonus of $165,000 during the 2004 fiscal year, largely due to his efforts in connection with the February 2004 Securities Offering.

28.    Each of the Defendants names above are collectively referred to herein as the "Defendants." The individuals named as defendants in ¶¶ 23-27 are referred to herein as the "Individual Defendants."

**Other Entities Involved in the Fraud**

29.    PwC was Authentidate's independent registered public accounting firm throughout the Class Period until it was dismissed by the Company on April 13, 2005.

30.    Roth Capital Partners, LLC is a full-service investment bank that provides financial services to emerging growth companies. While Roth issued high projections for the Company, it also served as a placement agent/underwriter of part of the February 2004 Securities Offering. Roth's incentives for promoting the stock at this time were influenced by its role in the securities offering.

**Group Pleading**

31.    The Individual Defendants are also liable for the false statements in SEC filings and press release as such statements represent "group-published" information, disseminated to the public as a result of the collective actions of the Individual Defendants.  It is appropriate to treat the Individual Defendants as a group and to presume that the false and misleading information conveyed in the public filings, press releases and other publications, as alleged herein, are the collective actions of the narrowly defined group of Individual Defendants identified above.  The Individual Defendants, by virtue of their high level positions within Authentidate, directly participated in the management of the Company, were directly involved with the day-to-day operations and were privy to confidential non-public information concerning the wholesale energy trading operations of Authentidate, as alleged herein.  The Individual Defendants were involved in drafting, reviewing and/or dissemination the false and misleading financial statements that were issued by Authentidate, approved or ratified these statements and, therefore, adopted them as their own.

**Duties of the Individual Defendants**

32.    Each of the Individual Defendants had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts relating to the financial reporting and results of operations of Authentidate.  To discharge their duties, these Defendants were required to exercise reasonable and prudent supervision over the dissemination of information concerning the business, operations and financial reporting of Authentidate.  By virtue of such duties, these officers and directors were required, inter alia, to:

    a)  conduct and supervise the business of Authentidate in accordance with federal laws;

b) supervise the preparation of the Company's SEC filings and to approve any reports concerning the financial reporting and results of Authentidate;

c) ensure that Authentidate established and followed adequate internal controls; and

d) create, enforce and comply with a corporate policy prohibiting misuse of proprietary corporate information by corporate officers and directors by trading in Authentidate stock based on material non-public information; and refrain from obtaining personal benefit, at the expense of the public purchasers of Authentidate securities, by misusing proprietary non-public information.

33.     As officers, directors and/or controlling persons of a publicly-held company which is registered with the SEC under the federal securities laws and whose common stock is traded on the NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the financial reporting and the publicly reported quarterly annual results of operations of Authentidate, so that the market price of the Company's publicly traded securities would be based upon truthful, accurate and complete information.

34.     Under the rules and regulations promulgated by the SEC under the Exchange Act, specifically Item 303 of Regulation S-K, the Individual Defendants also had a duty to report all trends, demands or uncertainties that were reasonably likely to impact Authentidate's:  (1) revenues; (2) expenses; and (3) previously reported financial information such that it would not be indicative of future operating results.  As set forth more fully below, the representations of the Individual Defendants during the Class Period violated these specific requirements and obligations.

## FRAUDULENT SCHEME

35.   Authentidate and the Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Authentidate securities by disseminating materially false and misleading statements and/or concealing material adverse facts that artificially inflated Authentidate's publicly traded securities.  The scheme involved (a) misrepresenting and concealing important facts concerning Authentidate's business and prospects stemming from the USPS Agreement; (b) concealing problems in meeting revenue metric requirements of the USPS agreement; (c) permitting Defendants Bunt and Botti to sell a total of 156,000 shares of their personally-held Authentidate stock for $1.7 million in illegal insider trading proceeds; (d) allowing the Company to raise over $69 million through a two-part securities offering in the market place; (e) causing Plaintiff and members of the Class to purchase Authentidate's securities at artificially inflated prices; and (f) concealing control deficiencies in the Company.  Later, however, Defendants' misrepresentations and fraudulent conduct were disclosed and it became apparent to the market that the Company had problems meeting the metric requirement established by the USPS Agreement.  Despite the Company's earlier assurances that it would modify the USPS Agreement with the USPS to ensure its compliance, Authentidate ultimately announced on May 27, 2005, that it had received a second notice of deficiency from the USPS.  On this final disclosure, the Company's share price fell $0.54, or 15.5%, from its closing price of $3.48 on May 27, 2005, to close at $2.94 on the following trading day, May 31, 2005, on unusually high trading volume of 1.28 million shares.  As a result of this announcement, Authentidate lost over $17.8 million in market capitalization.  Following the foregoing announcements, Authentidate's common stock declined a total of $15.75 per share caused by misrepresentations that were issued regarding the USPS Agreement until the truth was revealed

14

into the market place.  This decline represents a loss of approximately $520 million in market

capitalization that was directly and proximately caused by Defendants' materially false and

misleading statements.  Specifically, the common stock price dropped from a high of $18.69

per share on January 20, 2004 to as low as $2.94 per share on May 31, 2005.  As a result of

their purchases of Authentidate stock during the Class Period, Plaintiff and other members of

the Class suffered damages under the federal securities laws.

<strong><u>FRAUD-ON-THE-MARKET PRESUMPTION</u></strong>

36.    At all relevant times, the market for Authentidate's publicly traded securities was

an efficient market for the following reasons, among others:

a)    the common stock of Authentidate met the requirements for listing, and
was listed and actively traded on the NASDAQ, a highly efficient and
automated market;

b)    as a public company, Authentidate filed periodic public reports with the
SEC;

c)    Authentidate regularly communicated with public investors via established
market communication mechanisms, including through regular
disseminations of press releases on the national circuits of major newswire
services and through other wide-ranging public disclosures, such as
communications with the financial press and other similar reporting
services;

d)    the market reacted to public information disseminated by Authentidate;

e)    Authentidate was followed by several securities analysts employed by
major brokerage firms who wrote reports that were distributed to the sales
force and certain customers of their respective brokerage firms.  Each of

these reports was publicly available and entered the public marketplace; and

    f)    the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Authentidate securities; and without knowledge of the misrepresented or omitted material facts, Plaintiff and the other members of the Class purchased or otherwise acquired Authentidate securities between the time Defendants made the material misrepresentations and omissions and the time the truth was fully revealed, during which time the price of Authentidate securities was inflated by Defendants' misrepresentations and omissions.

37.    As a result of the foregoing, the market for Authentidate securities promptly digested current information regarding Authentidate from all publicly available sources and reflected such information in the price of Authentidate securities. Under these circumstances, all purchasers of Authentidate securities during the Class Period suffered similar injury through their purchase of Authentidate securities at artificially inflated prices and a presumption of reliance applies.

## BACKGROUND

38.    Authentidate is a worldwide provider of web-based content authentication services that address the verification of digital information in all business processes. The Company manufactures authentication software and document imaging systems. Authentidate's core service offering is based in secure content authentication, utilizing technology and business processes based upon auditable time stamps, hash codes and non-repudiation services. Authentidate helps protect content by detecting the fraudulent tampering

or inadvertent altering of electronic data, to maintain verifiable evidence of content authenticity.

39.   In May 1992 Authentidate commenced its Initial Public Offering of one million shares of common stock at an offering price of $3.50 per share.  In August 1994, the Company completed a secondary offering of one million shares of common stock at $5.00 per share.  The Company's stock price fluctuated between $2.50 per share and $5.50 per share until 1996 at which time it rose as high as $8.00 per share.  In March 1996 Authentidate acquired DJS Marketing and introduced the DocStar product line.  The Company's fluctuating stock prices and revenues were related to the costs of building a management and sales team, establishing a distribution network and advertising and promoting the new products in addition to attaining higher sales growth through the Company's new product line.  Thereafter, the stock price declined once again to as low as $0.72 per share due to the sale of a subsidiary company in June 1998.

40.   From October 1999 through the beginning of 2000, the Company's stock price rose to as high as $22.00 per share.  In early 2000, Authentidate formed a joint venture known as Authentidate International Holdings, AG, with a German company, Windhorst New Technologies, Agi. G., to market the Company to countries outside of the Americas, Japan, Australia, New Zealand and India.  Additionally, Authentidate formed two new subsidiaries in June 2000 to provide Internet-related services.  Thereafter, the Company's stock price dropped due to the development of the new subsidiaries, until approximately August 2002, when Authentidate began to issue false and misleading statements into the market place which artificially inflated the Company's stock prices.

41.   On July 31, 2002, Authentidate entered into a Strategic Alliance Agreement pursuant to which Authentidate would serve as the preferred provider of the USPS EPM service.  The EPM service is a web-based security service that provides evidence that the content of a document or file existed at a specific date and time.  It protects the integrity of the document or file by ensuring that it cannot be altered without detection.  Additionally, the EPM uses patent pending technology offering highly sophisticated encryption ensuring document authenticity.  Implemented as an XML-based web service by Authentidate, the EPM can be added to any application regardless of the computing platform or operating system.  Under the terms of the USPS Agreement, Authentidate's subsidiary, Authentidate Inc., would supply the marketing, management, technology and support for the USPS EPM system.  The USPS EPM service is primarily available through Microsoft Corporation's Office products.  In order to facilitate this product launch, Authentidate entered into development and promotional agreements with Microsoft and an affiliate of Microsoft in order to create the necessary software interfaces to Microsoft Office.

## FALSE AND MISLEADING STATEMENTS

42.   During the Class Period, Defendants issued a series of misstatements, and omitted to state material facts to the investing public concerning the true nature of the USPS Agreement.  In this regard, the public statements issued by the Company throughout the Class Period regularly touted the success of the USPS Agreement and the purported increases in revenues it would bring.  In fact, the Company failed to disclose its true obligations regarding the Agreement and concealed its inability to comply therewith.

43.   Each Defendant is liable for: (i) issuing false statements, or (ii) failing to disclose known adverse facts about Authentidate's USPS Agreement.  In this regard, Defendants:  (a) deceived the investing public regarding the Company's business and prospects stemming from

18

the Agreement; (b) artificially inflated the prices of the Company's publicly traded securities;

(c) allowed the Company and its senior executives to sell approximately $69 million worth of

Authentidate common stock at artificially inflated prices in February 2004 Securities Offering;

(d) allowed Defendants Bunt and Botti to sell $1.7 million worth of their Authentidate stock;

and (e) caused Plaintiff and other members of the investing public to purchase the Company's

securities at artificially inflated prices.

44.    On August 6, 2002, the Company issued a press release (the "August 6, 2002

Press Release"), entitled "AuthentiDate, Inc. Signs Strategic Agreement With U.S. Postal

Service to Provide Electronic Postmark Service." The press release stated, in part:

> New York, NY - August 6, 2002 -- *AuthentiDate, a subsidiary of*
> *AuthentiDate Holding Corp. (NASDAQ:ADAT), and leading provider of*
> *Trusted Content Authentication services, today announced that it has*
> *signed a strategic alliance agreement with the United States Postal*
> *Service to be the provider of the USPS Electronic Postmark® (EPM)*
> *service.* Under the terms of the agreement, AuthentiDate, Inc will provide
> the management, technology and support for the Postal Service's EPM
> service. The EPM brings a high level of integrity to electronic
> communications and transactions.
>
> *       *       *
>
> "Americans trust the Postal Service when they communicate via hardcopy
> mail," said Deputy Postmaster General John M. Nolan. "We believe that
> the USPS Electronic Postmark adds a comparable level of trust to
> electronic correspondence and transactions."
>
> *"We are pleased to see AuthentiDate and the U.S. Postal Service team*
> *up on such an ambitious web services project, and are very excited to see*
> *the USPS EPM being accessible from the Microsoft .NET platform,"*
> said Sanjay Parthasarathy, Vice President of Microsoft's .NET Platform
> Strategy Group. "The ability for developers to have programmatic access
> to a USPS electronic postmarking service will enable interesting and
> valuable scenarios for customers doing business over the Internet."
>
> *       *       *
>
> Sunil Misra, Vice President of Unisys Global Security Practice, stated,
> "The Postal Service and AuthentiDate EPM solution should have a
> significant influence on our customers' ability, via our Trusted
> Community Solutions (TCS), to conduct reliable, cost effective, secure

communications and transactions for today's environment. Unisys intends to support this initiative by integrating the USPS EPM into solutions within our target market's such as financial services and the public sector." "This strategic alliance is truly a landmark event. It will provide a trusted environment for the sending of electronic files of any kind and speed up the flow of business in a secure fashion," said Rob Van Naarden, CEO of AuthentiDate, Inc. *"We are delighted to be partnering with the Postal Service in this area since they represent the single most trusted entity in our society. This is a big win for all parties involved, business and consumers alike!"*

"According to ICANN (The Internet Corporation for Assigned Names and Numbers), it is estimated that over 3 trillion electronic transactions occur annually. Of those, ICANN estimates that 5%, or 150 billion are candidates for the electronic time and date stamping provided by the Electronic Postmark Service. Industry experts have also estimated that the market for date and time stamping will triple from its current base by the year 2005," stated John Botti, Chairman and CEO of AuthentiDate Holding Corp. "Previously, concerns about the ability to alter electronically created documents have dramatically slowed the development of ebusiness. However, with the backing of the United States Postal Service, these concerns will vanish."

45.    The August 6, 2002 Press Release reflected the Defendants' expectations that the USPS Agreement would be material to the Company's future business and prospects. However, unbeknownst to the investing public, the Agreement required Authentidate to attain certain performance metrics including the generation of minimum revenues over a specified period of time. From the inception of the Agreement, Defendants knew of the Company's inability to comply with those requirements and other inabilities to deliver and perform under the Agreement.

46.    On September 29, 2003, Authentidate filed its form 10-K for fiscal 2003 (the "September 29, 2003 10-K").[1] The September 29, 2003 10-K included a statement regarding the USPS's rights to cancel the agreement. The 10-K stated in part:

---

[1] Authentidate's fiscal year ends on June 30 until calendar year 2005, when its fiscal year will begin ending on December 31.

If the United States Postal Service cancels our agreement, we will not generate significant revenue from our Authentidate business and will need to incur additional costs in our efforts to successfully commercialize this product.

We entered into the strategic alliance agreement with the United States Postal Service to incorporate our Authentidate service into their Electronic Postmark ® Service. *The Postal Service has the right to cancel the contract in the event we are unable to perform our obligations and, after six months from the effective date of the agreement, the Postal Service may terminate the agreement at its convenience.* If the Postal Service terminates the agreement, we will not generate any meaningful revenue from the relationship and will not recoup valuable time and resources expended in negotiating and consummating the agreement. Further, if we are unable to commence realizing revenue from our Authentidate service, we will incur additional costs in developing our product and exploring alternative avenues in which to successfully market this product. This would further strain our cash resources and may force us to reduce current and proposed operations in an effort to conserve our cash resources.

47.   Defendant Botti signed the September 29, 2003 10-K.

48.   The September 29, 2003 10-K was materially false and misleading at the time it was made because it:

a)   deceived the investing public regarding the Company's business and prospects stemming from the USPS Agreement;

b)   concealed from the investing public that Authentidate's obligations under the USPS Agreement included generating substantial revenues to make the Agreement worthwhile to the USPS;

c)   concealed from the investing public that, from the inception of the USPS Agreement, the Company could not meet the requirements of the Agreement to attain certain performance metrics including the generation of minimum revenues over a specified period of time; and

21

d)   concealed from the investing public that there were control deficiencies in the

Company.

49.    Also on September 29, 2003, Authentidate hosted a conference call for analysts,

investors and media representatives to discuss its results and progress on the USPS Agreement.

During the call Defendant Botti stated:

> Now, I anticipate that some people will want to know what has been going
> on with our relationship with Microsoft, so I would like to address that at
> this time. Our relationship with Microsoft continues to evolve on many
> fronts.  We're nearing the release of the USPS Electronic Postmark Office
> extension for Microsoft Word, and are pleased with the truly integrated
> feel that users will experience.  We believe the added time we've spent in
> development, working with the USPS, United States Postal Service, and
> Microsoft, has been very important in making the Electronic Postmark
> functionality incredibly intuitive and business-friendly.
>
> The other areas we're working with, with Microsoft, include potentially
> adding Electronic Postmark functionality to other applications and the
> possible use of the EPM in the help in fighting spam, a problem which is
> estimated to cost anywhere between 10 and $30 billion a year to the U.S.
> economy.
>
> EPM functionality is also being marketed to Microsoft's development
> community, and we're very excited to participate in Microsoft's upcoming
> developer's conference at the end of October in Los Angeles.  Our goal is
> to get the interface for the EPM as the de facto standard in the Windows
> platform for content nonrepudiation, bringing legal value backed by the
> United States Postal Service, enabling Americans to truly feel safe
> conducting business electronically.

50.    During the conference call, an analyst asked:

> Will you just briefly describe the process that will occur when the EPM –
> because the way I understand it right now is that you cannot go and
> download – I don't know if the patch is the right term.  But download
> something from Microsoft or from the Postal Service just at this point that
> will allow you to have an electronic signature and buy some bucket of
> stamps.
>
> Can you delineate a little bit? Is that how it will work?  And when do you
> sort of anticipate – or maybe what the issues are that are keeping you from
> launching that right now?  I just want to make sure that I understand how

this is going to work. At some point in the future, as understand it here, in the near future, you are going to be able to go somewhere and give them a credit card, and that credit card is going to give you an electronic signature and some bucket of stamps. Do I understand that right?

51.   In response to the analyst's question, Botti replied:

Yes. First of all, let me just hit a couple of points here. Hopefully this will answer your question, but it will also frame the question for everyone else. Number one, the product from our perspective, the plug- in is fully functional. There is no ongoing development. It is ready to ship. ***The thing that we're waiting for is some, I will call it regulatory and legal okay from some of our partners, especially the U.S. Postal Service, whose brand is being applied to this.***

I have a list of two or three pages of all the different tests that it has to pass in all the different organizations. And we're moving along on that. That is a process that we anticipate will be completed very soon. When that is available, it will be announced that you can now go to the Microsoft website and to the Postal website and download a copy of this postmark. At the time of doing that, there are 7.5 million signatures that are already in existence. For instance, companies like Microsoft, I believe all of the employees already have an established digital signature that is backed by the company itself.

52.   The statements identified in ¶¶ 49-51 above were materially false and misleading at the time they were made because Defendant Botti:

a)   deceived the investing public regarding the Company's business and prospects stemming from the USPS Agreement;

b)   concealed from the investing public that Authentidate's obligations under the USPS Agreement included generating substantial revenues to make the Agreement worthwhile to the USPS;

c)   deceived the investing public by downplaying the difficulties that existed for the USPS Agreement to be fulfilled, including the requirement to attain the necessary metric revenues; and

23

d) concealed from the investing public that, from the inception of the USPS

Agreement, the Company could not meet the requirements of the Agreement to

attain certain performance metrics including the generation of minimum revenues

over a specified period of time.

53. On October 15, 2003, Roth issued a report on Authentidate by Andrew Lahde

based, in part, on Lahde's conversations with Authentidate management. The report, entitled

"Everything Is In Place For The Next Killer Application," stated in part:

> • AuthentiDate offers technology that enables users to verify the
> authenticity of the content, time and date of an electronic document. This
> coupled with the United States Postal Service's Electronic Postmark® and
> an electronic signature effectively allows legal documents to be
> transmitted and signed electronically.

> • The United States Postal Service has signed a five-year contract
> with three automatically renewable three-year extensions for the use of
> ADAT's Electronic Postmark, providing the company with a virtual
> monopoly on this application.

*       *       *

> • ***We believe that everything is in place for a rapid adoption of this
> potential killer application and that now is the time to purchase shares
> before the company's revenues begin growing exponentially. We are
> initiating coverage of AuthentiDate with a Strong Buy rating and $20
> price target.***

> We believe that we have uncovered an opportunity to invest in a company
> that is just on the cusp of exponential revenue and profit growth. Roughly
> three weeks ago, AuthentiDate (ADAT) quietly went "live" with its freely
> downloadable software in Germany. The rollout of Microsoft's Windows
> 2003 in the coming weeks will be an important milestone for
> AuthentiDate, as the USPS EPM® extension for Microsoft Office will be
> integrated into Windows 2003. The United States Postal Service has
> signed a five-year contract with three automatically renewable three-year
> extensions with ADAT to supply the technology supporting the Electronic
> Postmark®, providing ADAT with a virtual monopoly on the market.
> AuthentiDate is also completely supported by Microsoft, which it
> partnered with to develop an add-on for Microsoft Word. We believe this
> technology will ultimately be equally as important and as revolutionary as

24

email.  The difference between email and this technology is that AuthentiDate will generate revenue from each Electronic Postmark used.

Even with a very modest adoption rate, we believe the company will be profitable within one year.  With the same modest adoption rate, we believe AuthentiDate's net income will exceed $30 million in fiscal 2006 (ending June 30), which would justify a stock price roughly four times its current level.  We estimate that by the time six million individuals adopt the technology, AuthentiDate's net income will exceed $100 million.

This market is unproven, making this a speculative investment.  However, while the risk exists that adoption will be much slower than we anticipate, we believe that scenario is unlikely given the marketing power that Microsoft and the U.S. Postal Service will put behind this technology. Additionally, the tremendous savings that the Electronic Postmark (EPM) will provide users by eliminating the costs associated with preparing, shipping and storing paperwork will be a powerful motivator for adoption. We believe the adoption of this technology is inevitable and AuthentiDate is squarely positioned to profit from every transaction generated in this market.  As such, we recommend aggressive long-term positions to be taken by those whose risk tolerance is in line with this opportunity.

54.    The above-mentioned analyst report by Lahde was based on the materially false and misleading statements of Authentidate, indicating that the Company was poised to execute the USPS Agreement.

55.    Defendants had concealed from the investing public the fact that its obligations under the USPS Agreement included generating substantial revenues to make the Agreement worthwhile to the USPS.  In addition, Defendants deceived the investing public by downplaying the difficulties that existed for the USPS Agreement to be fulfilled, including the requirement to attain the necessary metric revenues.  Had Defendants disclosed the requirements to meet revenue metrics, analysts, such as Lahde, may not have been as quick to recommend purchases of the Company's shares because they would have known that everything was *not* in place for a rapid adoption of the USPS Agreement.

56.     Significantly, while Lahde's employer, Roth, was issuing high projections for the Company's coming year, it also served as a placement agent/underwriter of part of the February 2004 Securities Offering.  Roth's incentives for promoting the stock at this time were seemingly influenced by its role in the securities offering.

57.     After Roth projected the software company would be profitable within a year, *Reuters* reported on October 15, 2003 (the "October 15, 2003 *Reuters* article") that Authentidate shares reached its highest level in more than three years.  Specifically, the October 15, 2003 *Reuters* article, entitled "AuthentiDate shares jump 39 pct after 'strong buy,'" stated in part:

> ***Shares of AuthentiDate Holding Corp on Wednesday rose 39 percent after a brokerage firm initiated coverage with a "strong buy" rating and projected the software company would be profitable within a year.***
>
> The company said in June it would integrate its electronic document authentication service with Microsoft Corp.'s Office software.
>
> "We believe this technology will ultimately be equally as important and as revolutionary as email," said Andrew Lahde, an analyst with Roth Capital Partners.
>
> AuthentiDate said Microsoft Word users will be able to download software to enable them to digitally sign and seal documents that are protected under federal law.
>
> "The difference between email and this technology is that AuthentiDate will generate revenue for Each Electronic Postmark used," he said, adding he expected the company to be profitable within a year.
>
> AuthentiDate narrowed its loss to 14 cents from 16 cents a share in the most recent quarter.
>
> ***Shares of Schenectady, new York-based AuthentiDate, the No. 1 percentage gainer on Nasdaq, rose by $3.05 to $10.92 after hitting its highest level in more than three years.***

58.    Defendant's misrepresentations and omissions of materially adverse facts caused Roth to issue high projections for the Company's coming year, and caused the price of Authentidate's publicly traded securities to be artificially inflated.  Such statements and omissions, which were either known to Defendants or were recklessly disregarded by them: (a) deceived the investing public regarding the Company's business and prospects stemming from the USPS Agreement; (b) concealed from the investing public that Authentidate's obligations under the USPS Agreement included generating substantial revenues to make the Agreement worthwhile to the USPS (c) concealed from the investing public that, from the inception of the USPS Agreement, the Company could not meet the requirements of the USPS Agreement to attain certain performance metrics including the generation of minimum revenues over a specified period of time; and (d) concealed from the investing public that there were control deficiencies in the Company.

59.    Following the October 15, 2003 *Reuters* article, Defendants continued to issue promotional statements regarding the USPS Agreement and the higher profits it should bring to the Company.  In fact, on December 22, 2003, *Business Week's* Gene Marcial wrote a report on Authentidate in his "Inside Wall Street" feature, which included several such statements made by the Authentidate CEO.  The article stated in part:

> **With the U.S. Postal Service and Microsoft as partners, AuthentiDate Holding (ADAT) is catching the eye of investors.**  Its stock zoomed from 1.72 in March to 16 on Nov. 10, before sliding back to 9.95 by Dec. 10, after profit taking.  AuthentiDate has technology that lets users time-stamp electronic documents, such as e-mail and electronic payments, and verify the authenticity of signatures.  In 2002, the Postal Service signed a five-year pact to use the technology in its new Electronic Postmark product.  And Microsoft, which co-developed the technology, has made it an add-on to its Word program.  CEO John Botti says AuthentiDate gets paid about 80 cents per signature.  Among clients:  Deutsche Telekom, Dow Chemical, and Tmobile.  Tagging the stock a buy, David Lavigne of EdgeWater Research says the market is huge because of the big savings

for users, mainly corporate enterprises and the government.  Lavigne sees the stock hitting 21 in 12 to 18 months.  ***He expects AuthentiDate to be profitable in the fiscal year ending June 30, 2005, earning 90 cents on sales of $78 million and, for 2006, $1.54 on $123 million.***

60.  Defendants' statements regarding Authentidate's USPS Agreement were knowingly, or recklessly, materially false and misleading because they:

    a)  deceived the investing public regarding the Company's business and prospects stemming from the USPS Agreement;

    b)  concealed from the investing public that the USPS Agreement was contingent upon meeting established revenue and performance requirements;

    c)  concealed from the investing public that, from the inception of the USPS Agreement, the Company could not meet the requirements of the USPS Agreement to attain certain performance metrics including the generation of minimum revenues over a specified period of time; and

    d)  concealed from the investing public that there were control deficiencies in the Company.

61.  A further example of the Defendants' false and misleading statements was made at the annual Authentidate meeting in February 2003 by the Company's former CEO and President, Botti.  Specifically, Botti stated that "some of these contracts [such as the USPS Agreement] are going to give us revenue over a longer period of time."

62.  The above statement is false and misleading because, while Botti was attempting to attract investors by falsely stating that the USPS Agreement would almost certainly be carried out, he and the other Defendants were:

a) concealing from the investing public that the USPS Agreement included obligations to generate substantial revenues to make the Agreement worthwhile to the USPS; and

b) concealing from the investing public that, from the inception of the USPS Agreement, the Company could not meet the requirements of the USPS Agreement to attain certain performance metrics including the generation of minimum revenues over a specified period of time.

63.    Through the issuance of various false and misleading statements concerning the USPS Agreement and, in turn, the false expectations of high revenues created by Defendants, the Company was able to complete a two-part securities offering of its common stock to certain institutional and accredited investors at around the time in which the Authentidate stock price reached its peak.  Moreover, Authentidate's former CEO and President was awarded a cash bonus of $165,000 during the 2004 fiscal year, largely due to his efforts in connection with the February 2004 Securities Offering.

64.    Specifically, on February 5, 2004, the Company issued a press release announcing that it had completed a securities offering of $71.8 million shares of its common stock to certain institutional and accredited investors at $13.75 per share.  In connection with that securities offering, the Company issued an aggregate of 5,223,636 shares of its common stock and received approximately $67 million in net proceeds.

65.    In addition, on February 4, 2004, the Company completed a securities offering of 136,734 shares of its common stock for an aggregate purchase price of $1,880,092.50 to certain other accredited investors at $13.75 per share.  Authentidate received approximately $1.80 million in net proceeds from this transaction.  The February 2004 Securities Offering

was registered with the SEC on February 27, 2004 (the "Registration Statement"). The Registration Statement was signed by Defendant Botti.

66.    While the Company issued false and misleading positive statements early in the Class Period concerning the USPS Agreement, as the Class Period proceeded, the Company intentionally failed to issue subsequent statements concerning the true status of the Agreement, the Company's ongoing failure to perform under the Agreement and the Defendants' ongoing negotiations relating thereto.

67.    From February 2004 through September 2004, Authentidate made several public statements with the knowing omission of any mention of the USPS Agreement, which it had previously touted as a central component of its business. Thus, investors began to lose faith in the Company's ability to carry out the Agreement. As a result, Authentidate's share price began to decline to reflect the decreasing investor confidence -- despite the overall increase in market price of stocks on the NASDAQ at the time.

68.    These developments are a clear indication that Defendants' materially false and misleading statements and omissions regarding Authentidate's USPS Agreement had artificially inflated the price of the Company's publicly traded securities. In particular, as the Company released its false and misleading statements regarding the USPS Agreement, Authentidate common stock soared to as high as $18.69 per share in January 2004. In contrast, when the Company failed to release continued promotional statements regarding the USPS Agreement and its expectations for growth, Authentidate stock declined to as low as $5.11 per share in August 2004.

69.    In September 2004, the Company resumed issuing false and misleading statements concerning its business, in general, and concerning the USPS Agreement, in

particular, and the stock price remained relatively stable once again due to the artificial

inflation.  On September 8, 2004, after receiving a notice of deficiency from the USPS,

Authentidate was forced to reveal for the first time in a press release that the USPS Agreement

had established performance metrics when it was first signed, and that the Company had failed

to comply with those requirements.

70.   The September 8, 2004 Press Release, entitled "Authentidate Holding Corp.

Announced Fourth Quarter and Year End Results," stated in part:

> AuthentiDate Holding Corp. (NASDAQ: ADAT) announced today that
> revenue for the quarter ended June 30, 2004 was $5,151,000 compared to
> $5,795,000 for the same quarter a year ago. Revenue for the fiscal year
> ending June 30, 2004 was $19,242,000 compared to $25,286,000 for fiscal
> year ended June 30, 2003.
>
> Revenue for the quarter ended June 30, 2004 for the AuthentiDate
> segment, which consists of AuthentiDate, AuthentiDate International, AG,
> and Trac Medical Solutions, increased by approximately $104,000
> compared to the same quarter last year. The DocStar segment recorded a
> revenue increase for the quarter of almost $36,000 while the DJS segment
> reported a decline in revenue of close to $784,000 when compared to the
> same quarter last year.
>
> Much of the decline in revenue for the year was in the DJS segment. DJS
> experienced a decline of $5.5 million in revenue primarily due to a
> decrease in low margin direct hardware sales in 2004 compared to last
> year. DocStar also experienced a slight revenue decline for the year of
> slightly more than $500,000. Much of the DocStar revenue decline was
> due to a reduction of lower margin hardware sales offset by an increase of
> higher margin software only sales. The AuthentiDate segment,
> experienced an increase of approximately $4,000 for the year.
>
> Deferred revenue, mainly due to increases in the AuthentiDate segment,
> increased from June 30, 2003 to June 30, 2004 by $1.1 million.
>
> *     *     *
>
> The Company's cash position at the end of the year remained strong,
> reporting more than $74 million in cash on hand.
>
> As an update on the Company's service with the United States Postal
> Service's Electronic Postmark® (USPS EPM®), the Company stated that

it was encouraged with the recent news that the state of South Carolina has given an electronic document with an EPM the same legal standing as certified or registered mail for specific legal communications, such as service of process. The Company said that it expected the South Carolina law to have applications in the area of court summons process, charitable services auditing and communications and legal communications.

In addition, the Company stated that it has hired four new sales representatives each with a background in software and specific sales experience in the area of state and local government, legal and financial services. With these sales people now in place, AuthentiDate said it has begun a marketing campaign to build market awareness of the EPM technology.

***The Company and the Postal Service established certain performance metrics when the agreement was first signed. The original revenue metric has not been attained and with the benefit of two years of experience with the EPM business, the parties have been discussing new performance metrics. The Postal Service has notified the Company of its failure to comply with the revenue metrics, which commences a six month period to achieve compliance with the metrics. While there is no guarantee that the Company will be successful in completing the negotiations, the Company believes that it has reached an agreement in principal and anticipates that an agreement amending the original metrics will be completed shortly. The Company also stated that it has received notification from USPS that the Company's data center for the second time has been re-certified to process Electronic Postmark transactions for another year.***

71.     The Company also filed on September 8, 2004 its current report on Form 8-K (the "September 8, 2004 8-K") with the SEC, announcing its financial results for the fourth quarter and fiscal year ended June 30, 2004.  The September 8, 2004 8-K attached the Company's September 8, 2004 Press Release as an exhibit, repeating the same statements contained in the September 8, 2004 Press Release.

72.     Defendant Botti signed the September 8, 2004 8-K.

73.     The September 8, 2004 Press Release provided investors with an early indication of a potential threat to the alliance between Authenticate and the USPS, based on the

previously undisclosed requirement of revenue metrics. The September 8, 2004 Press Release was false and misleading because Defendants:

a) deceived the investing public regarding the Company's business and prospects stemming from the USPS Agreement by downplaying the significance of these announcement through assurances to the investors that Authentidate and the USPS had reached an "agreement in principle" to amend the Company's performance metrics under the USPS Agreement; and

b) concealed from the investing public that it could not meet the requirements of the USPS agreement to attain certain performance metrics including the generation of minimum revenues over a specified period of time since no amendments to the original metrics were ever made.

74. On this news, the Company's share price fell from a high of $8.00 per share on September 8, 2004, to as low as $7.01, over the next trading day following the September 8, 2004 Press Release, on a combined volume of over 1.9 million shares. As a result of this announcement, Authentidate lost approximately $32.7 million in market capitalization.

75. On September 13, 2004, Authentidate filed its Form 10-K for the year ended June 30, 2004 (the "September 13, 2004 10-K"). The September 13, 2004 10-K reiterated the performance metrics contained in the USPS agreement and Authentidate's inability to attain that goal.

76. Defendant Botti signed the September 13, 2004 10-K.

77. Furthermore, the September 13, 2004 10-K included in the risk disclosure section a description of how the Company's success was largely dependent upon the services of its Chairman of the Board and President, Botti. The loss of Botti's services was predicted to have

a material adverse effect on business and prospects.  Indeed, after Botti announced his

resignation in November 2004, Authentidate's stock declined to below $6.00 per share.

Despite this announcement, Authentidate's stock price remained relatively stable since

Defendants continued to issue false and misleading positive statements about the Company's

business.

   78.   On February 8, 2005, after Authentidate announced its second quarter and six

month results, the status of the USPS Agreement was discussed on the second quarter 2005

conference call:

> [CEO PAI]:  Next with respect to the U.S. Postal Service, as we
> previously reported at the shareholders' meeting, we are continuing to
> work with our partners at the U.S. Postal Service to work out our legal
> contractual issues and we are hopeful of resolving the situation some time
> in the near future.  Please be assured that when there is something to
> report on that front, we will certainly do so.

*     *     *

> [ANALYST]:  Hi, Suren and John.  Just – can you guys discuss revenue
> metrics that could potentially cure the Post Office contract covenants?
> And, in addition, is the Version 2 rollout, is that in any way get around
> some of the original covenants that existed in your first and original postal
> contract?  Thanks.

> [CAO WATERS]:  Peter, John Waters, first let me say that with respect to
> the revenue metrics they were developed years ago, and were probably
> developed without a degree of business planning.  And clearly when those
> metrics were developed, the verticals markets that are underpinning our
> business today were not well understood, which is not unusual, for a
> development stage company to think at some point in time early in its
> existence, that it could achieve certain things without doing a lot of
> planning.  So today, we're in a different ball game.

> We are looking closely at the verticals.  We are drilling down, doing a
> bottom-up analysis, and we are – we communicate with our partners at the
> U.S. Post Office just about daily in terms of what we are dong and how we
> are doing it.  And there is no disagreement that I am aware of on our
> approach to these very important market opportunities.

*We cannot – we have a nondisclosure agreement, so we're not really at liberty to discuss the specifics of the metrics. We did a few things recently which we think put us back in compliance, but that's – there's no guarantee that are [sic] Post Officer partners would agree with that. But I think more importantly, there's ongoing, daily contact and we are making decisions that are impacting the future of this business on a daily basis with our partners agreement.*

79.    During the February 8, 2005 conference call, Defendants issued materially false and misleading statements because:  (a) the Company deceived the investing public regarding the Company's business and prospects stemming from the USPS Agreement; and (b) the Company downplayed the true dangers in failing to reach the required revenue and made it appear as though it would now comply, despite the fact that it could not meet such requirements.

80.    Accordingly, investors were unable to comprehend the true nature and extent of Authentidate's inability to comply with the USPS Agreement, or to make an informed judgment regarding the potential financial impact of the revenue issues affecting the Company's inability to comply with the Agreement.

81.    Ultimately, On April 13, 2005 the Company filed its current report on form 8-K (the "April 13, 2005 8-K") with the SEC, announcing the dismissal of its outside accounting firm, PwC.

82.    Defendant Pai signed the April 13, 2005 8-K.

83.    Two days later, on April 15, 2005, CFO Bunt sent a letter to certain members of the Company's board of directors, advising them of the existence of corporate governance issues.

84.    The Company subsequently filed on April 28, 2005 its current report on Form 8-K (the "April 28, 2005 8-K") with the SEC, announcing that it engaged a new independent

registered public accounting firm. The April 28, 2005 8-K attached the Company's Press Release from April 29, 2005 (the "April 29, 2005 Press Release") as an exhibit, repeating the same statements contained in the April 29, 2005 Press Release.

85.    Defendant Pai signed the April 28, 2005 8-K.

86.    The April 29, 2005 Press Release announced that the Company had engaged special counsel to assist its audit committee in "resolving certain internal controls and corporate governance issues raised by the Chief Financial Officer."

87.    Despite the Defendant's earlier assurances that it would modify the USPS Agreement with the USPS to ensure its compliance, Authentidate announced in its May 27, 2005 Press Release that it had received a *second* notice from the USPS stating that the Company had failed to attain the minimum revenue required by the USPS Agreement during the period February 2005 through April 2005. Thus, the Company had not actually reached "an agreement in principle" to amend the terms of the Agreement as it had stated in September 2004.

88.    The May 27, 2005 Press Release, entitled "Authentidate Announces New Developments With United States Postal Service," stated in part:

> The Strategic Alliance Agreement designates Authentidate as the preferred provider of the USPS Electronic Postmark® (EPM) service. At the time the agreement was signed, the parties agreed on certain performance metrics which, as previously reported, had not been attained. The parties have been discussing a new arrangement since last year.
>
> \*        \*        \*
>
> ***In spite of these recent successful joint efforts by Authentidate and the USPS, the parties have been unable so far to agree on new performance metrics.*** On May 23, 2005 Authentidate was again notified by the United States Postal Service that it has failed to attain the revenue metrics required by the Strategic Alliance Agreement for the period of February 2005 through April 2005. The Postal Service has advised Authentidate in this letter that it is willing to discuss any further plans Authentidate may

have to attain the performance metrics. ***However, the Postal Service has also stated that it intends to exercise its right to terminate the Strategic Alliance Agreement if Authentidate is unable to cure this default.***

89.   On May 27, 2005 the Company filed its current report on form 8-K (the "May 27, 2005 8-K") with the SEC.  The May 27, 2005 8-K attached the Company's May 27, 2005 Press Release as an exhibit, repeating the same statements contained in the May 27, 2005 Press Release.

90.   Defendant Pai signed the May 27, 2005 8-K.

91.   The ongoing discussions with the USPS regarding the status the USPS Agreement had reached a critical stage with the receipt of this second notice.  Regardless of how much Authentidate downplayed the dangers of failing to comply with the required revenue metrics, ultimately, the USPS stated that it would terminate the Agreement if Authentidate does not fulfill its obligations.

92.   The market's reaction to these latest revelations was immediate.  Authentidate's share price fell $0.54, or 15.5%, from its closing price of $3.48 on May 27, 2005 to close at $2.94 on the following trading day, May 31, 2005, on unusually high trading volume of 1.28 million shares.  As a result of this announcement, Authentidate lost over $17.8 million in market capitalization.

## SCIENTER ALLEGATIONS

93.   In addition to the Defendants' interest in completing the February 2004 Securities Offering described above, as well as the extensive insider sales, the Defendants' scienter is demonstrated by their senior level positions at the Company and access to material information concerning the actual financial performance and conditions of the Company.  Bunt, as CFO, was responsible for financial reporting and communications with the market.  Many of the internal reports showing Authentidate's forecasted and actual growth were prepared by the

finance department under Bunt's direction.  Defendant Pai, as CEO, was responsible for the

financial results and press releases issued by the Company.  These in turn were based, in part,

on information prepared by Bunt and Pai.  Each Individual Defendant sought to demonstrate

that he could lead the Company successfully and generate the growth expected by the market.

Each Individual Defendant also owed a duty to the Company and its shareholders not to trade

on inside information.

## CONTROL PERSON LIABILITY

94.    The Individual Defendants are liable as direct participants with respect to the

wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status

as senior executive officers and/or directors were "controlling persons" within the meaning of

Section 20 of the Exchange Act and had the power and influence to cause the Company to

engage in the unlawful conduct complained of herein.  Because of their positions of control,

the Individual Defendants were able to and did, directly or indirectly, control the conduct of

Authentidate's business.

95.    Specifically, because of their positions with the Company, the Individual

Defendants possessed the power and authority to control the contents of Authentidate's annual

and quarterly reports, press releases and presentations to securities analysts, money and

portfolio managers and institutional investors, i.e., the market.  Each of the Individual

Defendants, by reason of his or her respective management or board positions, had the ability

and opportunity to review copies of the Company's SEC filings, reports and press releases

alleged herein to be misleading, prior to, or shortly after their issuance or to cause them to be

corrected.

96.    By virtue of their positions, the Individual Defendants had access to material non-

public information available to them but not to the public.  Each of the Individual Defendants

knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## THE SAFE HARBOR PROVISION OF THE PSLRA IS INAPPLICABLE

97.    The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which applies to forward-looking statements, does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Authentidate who knew that those statements were materially false when made.

## CLASS ACTION ALLEGATIONS

98.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a class (the "Class"), consisting of all those who purchased the securities of Authentidate during the Class Period and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

99. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the court. As of May 2005, Authentidate had more than 34 million shares of common stock outstanding, owned by hundreds if not thousands of persons. Throughout the Class Period, Authentidate common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Authentidate or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

100. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

101. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that are contrary to or in conflict with the members of the Class Plaintiff seeks to represent.

102. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the federal securities laws were violated by Defendants' acts as alleged herein; (b) whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material

40

facts about the business and operations of Authentidate; (c) whether the Individual Defendants are liable as control persons under the federal securities laws; (d) whether the prices of Authentidate's publicly traded securities were artificially inflated; and (e) whether the members of the Class have sustained damages and, if so, the proper measure of such damages.

103.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### FIRST CLAIM FOR RELIEF
**Violation Of Section 11 Of The Securities Act**
**Against Defendants Authentidate, Bunt, Smith, and Botti**

104.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

105.  The Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k on behalf of the Class, against Defendants Authentidate, Bunt, Smith, and Botti.

106.  The Registration Statement for the February 2004 Securities Offering was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

107.  Authentidate is the registrant for the February 2004 Securities Offering.  The defendants named herein were responsible for the contents and dissemination of the Registration Statement and the Offering Prospectus.

108. As issuer of the shares, Authentidate is strictly liable to Plaintiff and the Class for the misstatements and omissions.

109. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Offering Prospectus were true and without omissions of any material facts and were not misleading.

110. Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Offering Prospectus, which misrepresented or failed to disclose, inter alia, the facts set forth above. By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

111. Plaintiff acquired Authentidate shares traceable to and in reliance on, the Registration Statement.

112. Plaintiff and the Class have sustained damages. The value of Authentidate's common stock has declined substantially subsequent to and due to Defendants violations.

113. At the times it purchased Authentidate shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to February 2004. Less than one year elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff filed this Complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this Complaint.

## SECOND CLAIM FOR RELIEF

### Violation Of Section 12(a)(2) Of The Securities Act
### Against Defendant Authentidate and the Individual Defendants Who Signed the Offering Prospectus

114.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

115.  This claim is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of the Class against the Defendant Authentidate and the Individual Defendants who signed the Offering Prospectus.

116.  Defendants named in this claim were sellers and offerors and/or solicitors of purchasers of the shares offered pursuant to the Offering Prospectus in connection with the February 2004 Securities Offering.

117.  The Offering Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  The Defendants' actions of solicitation included signing the Offering Prospectus and participating in the preparation of the false and misleading Offering Prospectus.

118.  Defendants owed to the purchasers of Authentidate stock, including Plaintiff and other Class members, the duty to make reasonable and diligent investigation of the statements contained in the February 2004 Securities Offering materials, including the Offering Prospectus contained therein, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the February 2004 Securities Offering materials as set forth above.

119.  Plaintiff and/or other members of the Class purchased or otherwise acquired Authentidate stock pursuant to and/or traceable to the defective Offering Prospectus.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Prospectus.

120.  Plaintiff, individually and representatively, hereby offers to tender to Defendants those securities that Plaintiff and/or other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.  Class members who have sold their Authentidate shares are entitled to rescissory damages.

121.  By reason of the conduct alleged herein, the defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff and/or members of the Class who hold Authentidate common stock purchased in the February 2004 Securities Offering have the right to rescind and recover the consideration paid for their Authentidate shares and hereby elect to rescind and tender their Authentidate common stock to the Defendants sued herein.  In this regard, Plaintiff and/or Class members who have sold their Authentidate common stock are entitled to rescissory damages.

### THIRD CLAIM FOR RELIEF
**Violation Of Section 15 Of The Securities Act**
**Against Defendants Authentidate, Bunt, Smith, and Botti**

122.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

123.  This Count is brought pursuant to Section 15 of the Securities Act against Defendants Authentidate, Bunt, Smith, and Botti.

124.  Each of the defendants named herein was a control person of Authentidate by virtue of his position as a director and/or senior officer of Authentidate, and his substantial participation in the wrongful conduct alleged herein.  At the time of the February 2004 Securities Offering, the Individual Defendants named in this Count, by virtue of their respective positions of control and authority at Authentidate, directly and indirectly, had the power and authority, and exercised the same, to cause the Company to engage in the wrongful conduct complained of herein.

125.  The defendants named herein each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officer and/or major shareholder of Authentidate.

126.  Each of the defendants named herein was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and having otherwise participated in the wrongful conduct alleged herein.

## FOURTH CLAIM FOR RELIEF

### Violation Of Section 10(b) Of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

127.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

128.  This claim is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), by the Plaintiff against all Defendants.

129.  During the Class Period, Authentidate and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class

members, as alleged herein; (ii) artificially inflate and maintain the market price of Authentidate securities; and (iii) cause Plaintiff and other members of the Class to purchase Authentidate securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

130. The Defendants named in this count: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Authentidate securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

131. In addition to the duties of full disclosure imposed on the Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, the Individual Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

132. Authentidate and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material

information about the business, operations, financial performance and future prospects of Authentidate as specified herein

133.   These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Authentidate's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Authentidate and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Authentidate securities during the Class Period.

134.   The Individual Defendants' primary liability arises from the following facts:  (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period; (ii) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (iii) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

135.   The Defendants named in this Count had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or

omissions were done knowingly or recklessly and for the purpose and effect of, <u>inter alia</u>, concealing Authentidate's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by these Defendants' material misrepresentations and omissions concerning the Company's business, operations and financial performance throughout the Class Period, the Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were materially false or misleading.

136.  As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Authentidate securities were artificially inflated during the Class Period.  In ignorance of the fact that market prices of Authentidate publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased Authentidate securities during the Class Period at artificially high prices and were damaged thereby.

137.  At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Authentidate, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Authentidate

securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

138.  By virtue of the foregoing, Authentidate and the Individual Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated there under.

139.  As a direct and proximate result of the wrongful conduct of the Defendants named in this Count, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### FIFTH CLAIM FOR RELIEF

**Violation Of Section 20(a) Of The Exchange Act
Against the Individual Defendants**

140.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

141.  This claim is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), by Plaintiff against the Individual Defendants.

142.  The Individual Defendants acted as a controlling person of Authentidate within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, and ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements

49

were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

143. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

144. As set forth above, Authentidate violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions and actions as controlling persons of Authentidate, the Individual Defendants were culpable participants in the violations of Section 10(b) and are, therefore, liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(c)     Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial of all issues triable.

DATED:  August 2, 2005

ENTWISTLE & CAPPUCCI LLP

By: _____
Andrew J. Entwistle (AE-6513)
Robert N. Cappucci (RC-2193)
299 Park Avenue – 14th Floor
New York, NY  10171
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272

- and -

Chaka Patterson
Assistant Attorney General
Chief of the Special Litigation Bureau
Office of the Illinois Attorney General
100 West Randolph Street – 13th Floor
Chicago, IL  60601
 (312) 814-1137


**Attorneys for Plaintiff**

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

William R. Atwood declares the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      My name is William R. Atwood and I am the Executive Director of the Illinois State Board of Investment ("ISBI").

2.      As Executive Director of ISBI, I have been duly authorized to designate Entwistle & Cappucci LLP as counsel for ISBI in this action for all purposes, to pursue appointment of ISBI as lead plaintiff in this matter, and to seek approval of ISBI's selection of Entwistle & Cappucci LLP as lead counsel.

3.      ISBI did not acquire any of the relevant securities at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

4.      ISBI is willing to serve as a lead plaintiff in this action and it recognizes its duties as lead plaintiff to act on behalf of other class members in monitoring and directing the action, and, if necessary, testifying at deposition and trial.

5.      ISBI will not accept any payment for serving as a representative party beyond its *pro rata* share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

6.      ISBI has not served or sought to serve as a representative party for a class in an action under the federal securities laws within the past three years, except that:  (a) it has sought to serve as lead plaintiff in *Cox v. Delphi Corp.*, No. 05-cv-02637-NRB (U.S.D.C., S.D.N.Y.); and (b) in *In re Enron Corp. Sec. Litig*, No. H-01-3624 (U.S.D.C., S.D. Tex.), it filed a motion to intervene, which was subsequently granted, and is presently a named plaintiff in that case.

7.      ISBI's transactions during the proposed Class Period, September 29, 2003

through and including  May 27, 2005, in Authentidate (NASDAQ:  ADAT) securities, which are

the subject of this litigation, are set forth in the attached Schedule A.[1]

8.      I declare under penalty of perjury that the foregoing is true and correct.

Executed this ____ day of August 2005

By: _____

William R. Atwood
Executive Director
Illinois State Board of Investment

---

[1] While ISBI recognizes that, pursuant to the PSLRA, the longest class period asserted in the complaints already on file in the subject litigation is generally used to determine the largest financial interest, ISBI believes that the most appropriate class period begins on August 6, 2002 (when Authentidate announced its agreement with the United States Postal Service) and extends through May 27, 2005.  Accordingly, the attached Schedule A reflects ISBI's transactions during the period August 6, 2002 through May 27, 2005. In any event, because ISBI did not have any purchases or sales of Authentidate securities prior to September 29, 2003, its damages would be the same under both the current and extended class periods. ISBI has also filed a complaint contemporaneously with its Lead Plaintiff motion papers that reflects the extended class period.

## Schedule A

| Date | Activity | # of Shares | Price per Share | Total |
|------|----------|-------------|-----------------|-------|
| 1/29/2004 | Buy | 86,200 | $16.0004 | $1,379,234.48 |
| 1/30/2004 | Buy | 71,248 | 16.2455 | 1,157,459.38 |
| 2/2/2004 | Buy | 71,300 | 16.2884 | 1,161,362.92 |
| 9/8/2004 | Buy | 1,350 | 8.3230 | 11,236.05 |